Clerk, please call the last case. May it please the Court, Counsel. My name is Tom Licton. I represent William Mulligan. He is the Petitioner Appellant in this case. It is our position that not only is the decision of the Commission against the manifest weight of the evidence in certain respects, but there is actually no evidence to support some of the findings of the Commission, which actually were the arbitrator's findings. Initially, there's no evidence to support any finding other than the Petitioner was permanently and totally disabled as a result of his work injuries. There's two injuries in question, right? That's correct. One was in February and one was in May of 1994? That's correct. In February, looking at the evidence, looking at the briefs and the record, there's no evidence with regard to the February 1994 alleged incident that he ever sought any medical treatment? That's pretty much correct. I think there was a prescription or two that he had gotten from Dr. Stefancic, but pretty much he kept working and if he had any, he thought he went to the chiropractor once, but there was no evidence in the chiropractor's records of that. Let's focus in on that one. We've got the incident in February slips in midway. There's no follow-up medical treatment specifically for the injury and he's got admittedly, correct, a long history of knee problems. Absolutely. So why would the Commission's finding be against the manifest weight of the evidence with regard to the February accident? What evidence is there to support that his condition of well-being had anything to do with this alleged incident? Well, I'm not particularly concerned about that initial accident because the second accident was the one that really precipitated all the treatment and all of the subsequent disability. You took an appeal on the February one as well, did you not? I did. Okay, so now you're turning our attention to the May. You're not going to further the argument of a lack of evidence on the February incident? I'm sorry, I didn't quite hear what you said. I mean, if I missed something, I mean, that reduced to its simplest terms is what happened with regard to the February accident. He said he slipped in midway, his knee locked up, okay, never had any follow-up medical treatment specifically for the alleged incident in February, and has a history of knee problems. So the Commission finds that with regard to that, the claimant didn't prove that it was causally connected, that there was no finding of a causal connection to his condition of ill-being on that date. So you're saying, I mean, you're acknowledging it's a tough hurdle to overcome on the February accident, correct? That's right, and also because the Commission said, well, and I think the arbitrator also said, that the May accident superseded, I think is the word that they used, or he used, the February accident. So why is the Commission wrong in the May 94 incident? That's really the focus of it. Well, several reasons. One, the award was only for 50% men as a whole. There was numerous testimony, medical testimony, that the petitioner was permanently and totally disabled as a result of that accident. The respondent didn't provide any evidence whatsoever to rebut that testimony. There was testimony from Dr. Chamel, a board-certified orthopedic surgeon who was an examining doctor. Records from Dr. Stefansic, who was the petitioner's family doctor. And also testimony from, by way of evidence, deposition by Dr. Hopkinson, who was actually the respondent's examining doctor. And also Dr. Gates, who was somewhat of a treating doctor. And also Dr. Sweeney. But all of those doctors said, this man is permanently and totally disabled. They were all, all of them were questioned with regard to that issue, though based upon his knee injuries as well as his cervical injuries. In other words, the questions they were asked, based upon all this group of injuries that he has, is he permanently and totally disabled? That is true. I would point out that Dr. Chamel testified, well, with respect to the knee injury, that would confine him to sedentary work only. His work was sedentary, basically, although he did a fair amount of traveling. Basically, he was an executive. He did sedentary work. Dr. Chamel testified that the effects of the neck injury were such, he couldn't hold his head up more than a couple of hours. He had all kinds of problems with pain. He was taking all kinds of pain medication, very high doses of narcotic pain medication, that would disable him from anything else. So he basically already had a sedentary job. Putting aside the knee injury, the neck injury caused him to be permanently and totally disabled. Do you have any medical testimony to support that? Just on the neck injury? Just on the neck injury? Well, I think it's a logical conclusion from the testimony of Dr. Chamel, Dr. Hopkinson, and even... The doctors each testified about how each of these injuries affected him, but when it came down to expressing opinions about whether he was permanently and totally disabled, in every instance, it was based upon his entire complex of injuries, right? And then the commission ultimately determined that the knee injury was not related. In other words, none of the doctors were ever asked, doctor, if we just take the neck injury alone, would that cause him to be permanently and totally disabled, or words to that effect. That's correct. In other words, there was no causal connection opinion given by the doctors that the May 31st accident itself was the cause of the cervical spine and upper extremities permanent and total disability, correct? They never actually said that, did they? That's correct. They said that all of the knee condition and the neck and other conditions were related to the injury, the work injury. That's right. But I believe that if you understand, the way I understand the testimony, that is, if it was, if you consider that the knee injury wasn't work-related, which I think there's a problem there, which I expressed, discussed in my brief and so forth, even if you consider that, he still would have been, the knee injury wasn't permanently and totally disabling, that confined him to sedentary work. What caused him to be permanently and totally disabled was the neck injury, and the respondent never presented any evidence whatsoever to address that or to rebut the opinion. Well, he was working with the knee before he got the neck injury, and then it was over two years after the neck injury before he had any further knee treatment, right? So the knee was added to the neck injury down the road? Well, he had three surgeries for his knee, and then he also had, and that was, I think that might be right as far as two years. But he didn't actually have any treatment until, you know, a couple of years after this accident, no treatment to the knee, and he ultimately had another knee replacement surgery. Well, right. That's right. He had three, actually, and then the last one was a knee replacement. Right. That's right. And then he had his next surgery, and that really didn't do the job. He was still disabled. And the respondent put him on disability, as a matter of fact, in October of 1996. He was trying to keep on working. They said, you just can't do it, and they put him on disability. So that's one position that I have. Then also, the award for TTD benefits was only, was 12 weeks, and it was 12 weeks from the date of the next surgery. There's no evidence in the record to support that that was the only period that he was disabled, and there's also nothing in the record to support that he was only disabled for 12 weeks. And there's nothing in the arbitrator's decision to support that 12-week period. It's completely not in the record at all. The petitioner had already been disabled for two years before that, since 1996, based on not only his own doctor, but the respondent's own position. So that's not supported by the record. Also, the respondent, I mean, excuse me, the arbitrator denied the medical expenses for the cervical spine. And he didn't really give any reason for that, other than saying, well, I can't determine it from the evidence presented. Well, the evidence was all the medical bills, the itemized medical bills. Well, that was a 1,500-page exhibit, right? And, I mean, it was a 1,500-page exhibit of a large group of medical bills, some of which were doctors who treated him for both conditions. One of which the commission found was not related. That's right. I don't know exactly how many pages it was, but it was very... Do you disagree with the arbitrator's statement that you could not determine what the compensable medical bills are from that 1,500-page exhibit? Well, I do disagree with that, because I think... Did you point it out, or did you just give him the 1,500-page report? Well, it was a group exhibit. But if the arbitrator looked at the records, he could easily see which ones were for the cervical spine and which ones were for the knee. Because, I mean, I don't... I didn't separate it as to, you know, which is for the knee and which is for the cervical spine. But we know who was treating him for each condition. Is that your vote for not doing that? Well, you know, honestly, I don't think so. I don't think that... I mean, first of all, I don't even think that the finding on the knee was correct, for reasons which I pointed out. And I think there's some legal problems, some very significant ones, like Section 12 of the Act, or even admitting into evidence the testimony of Dr. Kornblatt. Let me ask a question about that, if I can. Dr. Kornblatt, actually, he's the only one who expressed an opinion that the knee was not related. Is that right? That's right. And the commission, they had to rely, that's part of your argument, they had to rely on him. But you say he should have been excluded under Section 12. He testified live after a records review. That's right. Does a physician testifying based on a records review, is that governed by Section 12? I think it certainly is. Do you have any authority to support that? I don't know why it would be any different from any other. Well, on its face, it deals with physical examinations. There was no physical examination done by Dr. Kornblatt. Is that right? That's right. This wasn't argued in either brief. But do you know of any authority where the Supreme Court has ever said that Section 12 applies to a physician testifying based upon a records review? Offhand, I don't. But I don't know why there would be any logical difference between a Section 12 exam or a records review. And the testimony, the trial of the case began on April 20th, 2004. There was, and depositions of Dr. Gates and Dr. Chemel were taken shortly thereafter. You're supposed to close proofs in July. Respondent gave the, I mean, the arbitrator gave the respondent more time, and finally they came up with this report of Dr. Kornblatt, I believe after they realized that Dr. Hopkinson was actually a lot more favorable to the petitioner than to them. Hopkinson gave you causation? He did, and he also agreed that the neck condition, throwing in the neck condition would also disable the petitioner. But they didn't even provide that report until about two months after the trial began. So I don't think that would be admissible either. Although, as I did say in my brief, I think it was very favorable, Dr. Hopkinson was very favorable to the petitioner. So I don't see excluding, if you do exclude both of those, and certainly if you exclude Dr. Kornblatt, then the finding of the knee condition not being work-related is not supported by any evidence, certainly against the manifest way of the evidence. You knew, or you, I assume, should have known that your client underwent a physical examination by Dr. Hopkinson in 1999. Is that right? I mean, I know there's a dispute about whether you got the report, and when you got the report, or whether you got the report more than once, or whatever. But, I mean, you knew he had a Section 12 exam in 1999. I would imagine that I did, because they would have had to notify me, they're supposed to. But they never sent it to me. Why was this case tried in three days over a period of more than two years? Well, I think because the respondent kept requesting continuances for various reasons, which I didn't think were legitimate. Because when we took the petitioner's testimony on April 20th, the arbitrator continued it to July 14th to close proofs. We took our depositions and were ready to go at that time. Respondent kept requesting continuances. They had a couple of dates when they were going to bring in Dr. Kornblatt to testify, and for one reason or another, he didn't show up. Then they wanted more continuances because they said they wanted to bring in witnesses. They never brought in any witnesses. They wanted to rebut the petitioner's testimony. They said that the executive vice president, Marshall Lehman, The petitioner testified that the executive vice president, Marshall Lehman, told him, you can't work here anymore, you've got to go on disability. They said, the attorney who was handling that at the time said, I want a continuance or another continuance to bring her in, and they said witnesses. So I don't know who the other witnesses were, but they mentioned her specifically. Finally, the arbitrator agreed he wasn't going to give any more continuances. So. Thank you, counsel. Thank you. Counsel, please. Members of the panel, counsel, my name is Chris Carr. On behalf of the respondent in this matter, before I get started, are there any specific questions members have that they would like me to address? Do you agree that Kornblatt's the only doctor that says there's no causation on the knee? I agree that Kornblatt does give that specific opinion. However, looking at the arbitrator's decision with respect to the May 1994 accident, he addresses it on page 5 of his decision, which is 813. He disputes the causal connection, or he doesn't find causal connection, because of what he believes are what's represented in the medical records, complaining of the hyperextension or hyperflexion of the knee, as well as a significant gap in treatment from the time of the occurrence until 1996, as well as the fact that he had a significant preexisting condition, and there was evidence to suggest that he was going to need a knee replacement surgery. Well, there was evidence in other medical records, though, where he did describe hyperflexing his knee on that occasion. Correct. I mean, the arbitrator just cherry-picked one record out and referred to that one. But back to my point, if Kornblatt's testimony goes out, then there's no evidence that there wouldn't be a causal connection, at least from any doctor's opinion. Is that true? All other doctors testified there was a causal connection on his knee injury. I would concede that, yes. Go ahead. And with respect to Dr. Kornblatt's opinion, and I apologize that it wasn't brought up, that this was not a Section 12 exam, but rather it was a records review, is that Dr. Kornblatt's opinion and testimony, I think, with the City of Chicago case, and in particular Dr. Slack's report in that the trial had started, testimony by a petitioner, then Dr. Kornblatt did the records review, that was provided well in advance of him testifying in the case, so there was no surprise or prejudice with respect to that testimony. And with respect to the findings of the arbitrator and the commission, the intermingling of the knee injury with the neck injury made the proofs extremely convoluted and difficult to take out. Okay, this is related to the cervical spine, this is related to the knee. Is there an opinion in and of itself that the knee or that the cervical spine causes permanent and total disability? No. And based on the record as well, we would ask that the decision be affirmed. Thank you. Thank you, counsel. Rebuttal? Rebuttal, counsel? Just very briefly, I think that the issue of surprise may be essential to the question of whether there would be a problem with admission of Dr. Kornblatt's records review report or testimony, because obviously when the trial of the case began in April of 2004, there was no way of knowing where there was, in fact, there wasn't any involvement of Dr. Kornblatt whatsoever. So his opinion was a complete surprise based on what was known at the time the trial began. And I think in the city of Chicago case, this court premised the decision on that issue. So if there's a report that isn't in existence when the trial begins, that certainly shouldn't be any different than withholding a report that already is in existence at the time the trial begins. Whether it's a records review or an exam, I don't think that should make any difference. Thank you. The court will take the matter under advisement for disposition. We'll stand at recess until 9 o'clock in the morning.